## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

|  |  |  |  |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff/Respondent, | ) | | |
| | ) | | |
| v. | ) | Case Nos. | 20-CV-2303 |
| | ) | | 14-CR-20042 |
| SHANNON LOGAN, | ) | | |
| | ) | | |
| Defendant/Petitioner. | ) | | |

### THE UNITED STATES OF AMERICA'S RESPONSE TO
### PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255

The United States of America, by Douglas J. Quivey, Acting United States Attorney for the Central District of Illinois, through undersigned government counsel, respectfully requests that this Court deny petitioner Shannon Logan's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. Petitioner's motion and supplemental memorandum lacks merit because 1) he waived his right to collaterally attack his conviction and sentence as part of this plea agreement, 2) his motion is untimely, 3) he has failed to establish that the district court was actually biased against him, 4) any potential violation of the federal recusal statute is not cognizable under § 2255, and 5) the outcome would not have been different even if counsel's representation was ineffective. In support, the United States submits the following:

## PROCEDURAL HISTORY AND BACKGROUND[1]

Petitioner Shannon Logan, actively traded child pornography and collected over 300 images and videos of child pornography between March and May 2014. PSR ¶ 15, 17. Petitioner's conduct was not limited to just trading images of child sexual abuse, however, he also raped a child in his care repeatedly for a year prior to his arrest. PSR ¶ 31; PSR, Addendum. On July 22, 2014, a federal grand jury in the Central District of Illinois returned an indictment charging petitioner with one count of Distribution of Child Pornography, in violation of Title 18, United States Code, Section 2252A(a)(2)(a) and (b)(1), one count of Receipt of Child Pornography, in violation of Title 18, United States Code, Section 2252A(a)(2)(a) and (b)(1), and one count of Possession of Child Pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(b) and (b)(2). R. 1.

United States District Court Judge Colin S. Bruce ("Judge Bruce") presided over the *Logan* criminal proceedings. Prior to receiving his commission on October 8, 2013, Judge Bruce served as an Assistant U.S. Attorney ("AUSA") in the Central District of Illinois, beginning in 1989. *See* Questionnaire for Judicial Nominees, United States Senate

---

[1] Our citations to the record use the following abbreviations: "D.E." means "docket entry"; "R." followed by a number refers to the document bearing that number on the district court's docket sheet in the underlying criminal case (14-CR-20042). The presentence report ("PSR") was revised on multiple occasions; citations are to the final revised PSR, which is found at R.18. The petitioner filed a *pro se* motion (R.29) and a counseled supplemental memorandum (R.31) with accompanying exhibits, references to "Pet. Br.", and "Pet. Ex.", respectively are to this counseled memorandum. A short appendix is included with this response; citations to the government's appendix are to "Gov. App."

Committee on the Judiciary, Responses to Questions 6 and 16(a).[2] Between 2007 and 2010,
Judge Bruce served as the Supervisory AUSA of the Urbana Branch Office of the U.S.
Attorney's Office for the Central District of Illinois ("USAO"), and between 2010 and
October 2013, he served as the Office's First Assistant U.S. Attorney under United States
Attorney James A. Lewis. *Id.*, Response to Question 16(a).

## I.  Petitioner's Plea And Sentencing

AUSA Elly Peirson, undersigned counsel, prosecuted this case from its inception. *See
generally,* docket 14-20042. Petitioner appeared before United States Magistrate Judge
David G. Bernthal and pled guilty to all counts in the indictment pursuant to a plea
agreement on October 2, 2014. R. 11; D.E. 10/2/2014.

The terms of his plea agreement bound the Court to sentence him to no less than 151
months and no more than 300 months, hinging on the Court's determination of whether
or not the five-level pattern of abuse enhancement under § 2G2.2(b)(5) was applicable.
R. 11 at 7-8. Under the terms of the agreement, petitioner and the government reserved
the right to argue their positions on the applicability of this enhancement. *Id*. at 7. The
factual basis supporting the government's position on the pattern of abuse enhancement
stemmed from the disclosure of a then 13-year-old minor that Logan had access to who
stated that Logan engaged in sexual intercourse with her repeatedly for over a year. PSR,
Addendum. She reported that the abuse was coupled with threats to harm her if she

---

[2] Found at https://www.judiciary.senate.gov/imo/media/doc/061913QFRs-Bruce.pdf (last
viewed March 16, 2021).

disclosed. *Id*. The child detailed her abuse from under a blanket, too ashamed to show her face while weeping throughout her interview with the child advocacy center. *Id*. In addition, law enforcement seized Logan's diary and extracted chat messages where he bragged to others about abusing this minor. *Id*. The government submitted the minor's interview for the Court's review in advance of the sentencing hearing without objection. R. 20.

At the sentencing hearing, defendant withdrew his objection to the pattern of abuse enhancement conceding the underlying sexual abuse of the minor. R. 22. Defendant further stipulated that the appropriate sentencing guidelines range was 262 to 327 months on Count 1 and 2. *Id*. at 2.

The probation officer calculated that petitioner's total offense level under the advisory Sentencing Guidelines was 39. PSR ¶ 64. That offense level included the undisputed five-level increase for petitioner's pattern of sexual abuse of a minor. PSR ¶¶ 31. An offense level of 39 and criminal history category of I resulted in an advisory Guidelines range of 262 to 327 months in prison for Counts One and Two (recognizing the statutory maximum was 240 months, but the guidelines suggested consecutive sentences, USSG § 5G1.2(d)) and 120 months in prison for Count Three. PSR ¶ 64. The government recommended a sentence of 300 months in prison, in accordance with the plea agreement.

On February 2, 2015, Judge Bruce sentenced petitioner to a within guidelines (and within his agreed range) sentence to 240 months in prison on Count One, 240 months in prison on Count Two, with 180 of those months to be served concurrently with Count

One, and 60 months to run consecutive to Count One, and 120 months on Count Three to be served concurrently with Counts One and Two. R. 24. The Court entered judgment on February 4, 2015. *Id.*

Petitioner did not appeal his conviction and sentence. When a prisoner does not take a direct appeal from his conviction, the conviction becomes final when the time for filing a notice of appeal expires. *Clay v. United States,* 537 U.S. 522, 525 (2003); *United States v. Woods,* 169 F.3d 1077, 1078 (7th Cir. 1999); *Sanchez-Castellano v. United States,* 358 F.3d 424, 428 (6th Cir. 2004). Therefore, his judgment became final on February 18, 2015. 28 U.S.C. § 2255(f); Fed. R. App. P. 4(b)(1)(A).

Over five and half years after petitioner's judgment became final, he filed the instant motion under 28 U.S.C. § 2255.

## II. **Petitioner Waived His Right To Collaterally Attack His Conviction And Sentence**

As a threshold matter, this Court should dismiss the motion finding that petitioner waived his right to collaterally attack his conviction and sentence. The petitioner pled guilty to the indictment pursuant to a written plea agreement and with the assistance his counsel, Elisabeth R. Pollock. In exchange for the concessions made by the United States in the agreement, the petitioner waived his right to collaterally attack his sentence, including any ineffectiveness of counsel:

> The defendant also understands that he has a right to attack his conviction or sentence collaterally on the grounds that the Constitution or laws of the United States were violated, he received ineffective assistance from his attorney, this Court was without proper jurisdiction, or the conviction or sentence was otherwise subject to collateral attack. The defendant understands such an attack is usually brought through a motion pursuant

5

to Title 28, United States Code, Section 2255.  The defendant and his attorney have reviewed Section 2255, and the defendant understands the rights that statute gives him. The defendant's attorney has fully discussed and explained this waiver with the defendant but has made no recommendation to the defendant as to the waiver of a motion under Title 28, United States Code, Section 2255. The defendant specifically acknowledges that the decision to waive the right to challenge any later claim of the ineffectiveness of the defendant's counsel was made by the defendant alone notwithstanding any advice the defendant may or may not have received from the defendant's attorney regarding this right.[3]

R. 11 at 17.

In the Seventh Circuit, a waiver in a plea agreement of a right to file a motion under 28 U.S.C. § 2255 is enforceable as a general rule. *Jordan v. United States,* 2008 WL 1722190, *2 (C.D. Ill., 2008); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000); *Jones v. United States,* 167 F.3d 1142, 1145 (7th Cir. 1999). The Seventh Circuit has "never been reluctant to hold criminal defendants to their promises." *Roberts v. United States*, 429 F.3d 723, 723 (7th Cir. 2005) (dismissing Section 2255 proceeding based on waiver in plea agreement). The Seventh Circuit has "repeatedly recognized that appellate and collateral review waivers cannot be invoked against claims that counsel was ineffective in the negotiation of the plea agreement." *Hurlow v. United States*, 726 F.3d 958, 964 (7th Cir. 2013).

Petitioner's § 2255 motion does not specifically allege defense counsel's ineffectiveness in negotiating the plea agreement. Even if this Court were to liberally

---

[3] Petitioner's agreement pre-dates the October 14, 2014, change in the Department of Justice's policy to no longer seek a waiver that the defense attorney was ineffective in plea agreements. Nevertheless, federal courts have uniformly held a defendant may generally waive ineffective assistance claims, and that these waivers are both legal and ethical. This change in Department policy does not confer any rights on the petitioner.

construe his motion, his broad and unsupported assertions fail to circumvent his waiver and should be denied. *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017) (citing *Hurlow*, 726 F.3d at 964).

The record instead shows that petitioner received counsel and voluntarily agreed to waive "any and all" issues related to his plea and sentence in order to receive the benefit of his plea:

> Regardless of any advice his attorney has given him one way or the other, in exchange for the concessions made by the United States in this Plea Agreement, the defendant hereby knowingly and voluntarily waives his right to challenge any and all issues relating to his plea agreement, conviction and sentence, including any fine or restitution, in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255. The defendant acknowledges and agrees that the effect of this waiver is to completely waive any and all rights and ability to appeal or collaterally attack any issues relating to his conviction and to his sentence so long as the sentence is within the maximum provided in the statutes of conviction, excepting only those claims which relate directly to the negotiation of this waiver itself.

R. 11 at 17.

Further, petitioner emphasized that he was waving these rights voluntarily because he felt it was in his "best interest to do so:"

> The defendant states that he has not been coerced, threatened, intimidated, or in any other way involuntarily persuaded to waive his rights to appeal or collaterally attack his sentence by his attorney or anyone else. The defendant is waiving those rights because he *personally* believes it is in his best interest to do so in order to obtain the benefit of the concessions made by the United States in this agreement. The defendant understands the United States is unwilling to make some of those concessions unless he is willing to waive his rights to appeal or collaterally attack his sentence as part of the bargain. The defendant asks the Court to accept this waiver so he can receive the full benefit of this agreement.

R. 11 at 17, emphasis in original.

Petitioner acknowledged, both in the plea agreement and under oath in open court, that he was "satisfied with the legal services provided by [his] attorney in connection with this case, this Plea Agreement and matters related to it," that he "fully understood" this agreement and accepted and agreed to it without reservation, including the paragraphs labeled "Waiver of Right to Appeal" and "Waiver of Right to Collateral Attack," and that he entered into the plea 'agreement voluntarily and of [his] own free will in order to gain the benefit of the promises made by the United States." R. 11 at 21. Voluntary responses made by a defendant when entering a guilty plea are binding and entitled to a presumption of verity and such representations made by the defendant under oath are entitled to presumption of correctness. *United States v. Chapa,* 602 F.3d 865, 869 (7th Cir. 2012); *United States v. Martinez*, 169 F.3d 1049, 1054 (7th Cir. 1999); *United States v. Price*, 988 F.3d 712, 717 (7th Cir. 1993).

The Court can examine the content and the language of the plea agreement and the plea colloquy between petitioner and the Court in determining whether petitioner knowingly and voluntarily entered into a plea agreement. *United States v. Jackson*, 2011 WL 3163172, 5 (N.D. Ind. 2011)(citing *United States v. Woolley*, 123 F.3d 627, 632 (7th Cir. 1997)). When a sentencing court engages a defendant in a detailed colloquy pursuant to Federal Rule of Criminal Procedure 11 and discusses with a defendant his rights and the consequences of his guilty plea, the testimony of the defendant at that hearing is accorded a "presumption of verity." *Id. (citing United States v. Ellison*, 835 F.2d 687, 693 (7th Cir. 1987)). Courts may consider a defendant's signature on the plea agreement and his

statements during the plea colloquy as evidence of a knowing and voluntary waiver. *United States v. Jemison*, 237 F.3d 911, 917 (7th Cir. 2001).

Petitioner claims that Federal Public Defender Thomas Patton failed to preserve his appearance of bias claims, however, petitioner has not specifically challenged the validity of his waivers or shown that the waivers were not knowingly and voluntarily made. Instead the record shows the opposite, that throughout the written Plea Agreement, which petitioner signed, and during the plea colloquy, petitioner expressed his understanding of his rights and the various waivers contained in the agreement, including the Waiver of Right to Collateral Attack. *See* R. 11 at 21-22. Specifically, that he "has not been *coerced, threatened, intimidated*, or in any other way involuntarily persuaded to waive his rights to appeal or collaterally attack his sentence by his attorney or anyone else." *Id*. at 21, emphasis added.

Given petitioner's knowing and voluntary waiver in the plea agreement, his § 2255 motion should be dismissed.

## III.  *United States V. Nixon* And The Disclosure Of Emails

Because petitioner's motion relies so heavily on the proceedings of other cases, some context and case history of those other cases, particularly *United States v. Nixon*, is necessary. A grand jury indicted Sarah Nixon on one count of international parental kidnapping in violation of 18 U.S.C. § 1204. *United States v. Nixon*, No. 15-20057 (C.D.Ill.), R. 7. United States District Judge Colin Bruce presided over a six-day jury trial in December of 2016, which ended in a guilty verdict. *Id.* at R.107, 140-45. Judge Bruce sentenced Nixon to twenty-six months of imprisonment followed by one year of

supervised release. *Id.* at R. 120. Nixon appealed her conviction, challenging the district court's interpretation of 18 U.S.C. § 1204, the court's jury instructions, and certain evidentiary rulings. The Seventh Circuit Court of Appeals affirmed in a published opinion in August 2018. *United States v. Nixon*, 901 F.3d 918 (7th Cir. 2018).

Before his appointment to the district court, Judge Bruce worked as a federal prosecutor in the Central District of Illinois for twenty-four years, and "not surprisingly, [he] maintained friendships with some of his former colleagues while on the bench." *E.g.*, *United States v. Williams*, 949 F.3d 1056, 1059 (7th Cir. 2020). During Nixon's trial, Judge Bruce exchanged emails about the trial with Lisa Hopps, a paralegal in the United States Attorney's Office ("USAO") who was not involved in the *Nixon* prosecution. Ms. Hopps did not disclose that exchange to anyone else at the time. [4]

On May 30, 2018, the United States disclosed the emails that had just been discovered by the *Nixon* prosecution team. Among those emails was one where "Judge Bruce criticized one of the prosecutors as being 'entirely unexperienced' turning a 'slam-dunk' case into a '60-40' for the defendant." *Williams*, 949 F.3d at 1059. Since learning of the

---

[4] The U.S. Attorney's Office subsequently conducted a search of its email archives for any email sent to or received from Judge Bruce or his chambers' email account, to examine those emails for potential ex parte communications, and disclosed any such emails to the attorneys of record for those cases. That search led to the disclosure of the email pertinent to this case. Those emails are part of the public record in the *Nixon* case; *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020); *United States v. Gmoser*, Case No. 14-CR-20048 (C.D.Ill.); *United States v. Atwood*, 941 F.3d 883 (7th Cir. 2019); *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020); and *United States v. Shannon*, Case No. 18-CV-2233 (C.D.Ill.), and summarized extensively in opinions in those cases. Petitioner asks this Court to incorporate by reference the set of emails the government disclosed and are part of the record in several cases, including specifically, the *Nixon* case, 15-CR-20057, R. 214-1. The government has no objection and joins in this request.

December 2016 email string involving the *Nixon* trial, the U.S. Attorney's Office has identified 1,233 documented communications that involved Judge Bruce and one or more members of the USAO.[5] The vast majority of these communications do not involve substantive discussions regarding cases. In fact, a number of these communications and attachments involved multiple addressees in addition to U.S. Attorney's Office personnel and concerned, for example, matters such as birth, death, and other personal announcements; courthouse holiday and social gatherings; building maintenance and security issues; court administration; employment and retirement announcements; and administrative issues relating to Judge Bruce's departure from the U.S. Attorney's Office. *See, throughout,* Bates Nos. 4-3789.

Of the 1,233 communications, the U.S. Attorney's Office has identified 101 communications (478 pages, including attachments, duplicate emails, and duplicate

---

[5] These communications include 1,230 emails, a number of which include multi-page attachments, such as search warrant documents, advance copies of plea agreements, and criminal complaint documents. *See* Bates Nos. 1-2266, 2268-2992, 3008-3720, 3725-3789. In addition to the emails, the U.S. Attorney's Office identified three other communications: (1) an April 14, 2016, email memorandum to file prepared by a supervisory AUSA regarding a conversation he had with Judge Bruce during which the judge was critical of an AUSA, *see* Bates Nos. 3721-3722; (2) a March 10, 2017, letter from an AUSA to a defense attorney, see Bates No. 3723; and (3) a screen shot of a May 2018 text message string between Judge Bruce and a USAO paralegal (three text messages, total). *See* Bates No. 3724.

There is an additional document that is not included in this number. That additional document is an internal memorandum written by an employee of the United States Attorney's Office concerning a verbal communication(s) that the employee had with Judge Bruce. The conversation(s) with Judge Bruce that the author documented in the internal memorandum was not an ex parte communication and did not pertain to any defendant or any case. The internal memorandum also contains privileged and confidential information; therefore, the internal memorandum was submitted to the Court *in camera* for the Court to make a determination on which parts of the memorandum, if any, can be disclosed. On February 10, 2020, the Court (Shadid, J.) ordered the disclosure of certain parts of this memorandum in the *Nixon* case (R. 209).

attachments) that each (1) were, or were part of a series of, potentially ex parte communications;[6] and (2) were not previously disclosed to defense counsel in the cases to which the communications related. In general, but not exclusively, the ex parte communications involving U.S. Attorney's Office personnel and Judge Bruce (or his chambers' email address) related to the scheduling of hearings; the provision of documents, such as plea agreements and jury instructions, to the judge in advance of a hearing or trial; and Judge Bruce inquiring about or USAO personnel informing the judge of whether the United States anticipated a particular case going to trial.

On or about March 19, 2019, in an abundance of caution, the government sent letters to every defendant whose case Judge Bruce handled, whether or not there were emails involving their specific cases or not, including petitioner, informing them that the U.S. Attorney's Office had learned of an ex parte communication between Judge Bruce and members of the office related to the case of *United States v. Nixon*, Case No. 15-CR-20057 (C.D.Ill.). Gov. App. 146-48. The letter further informed petitioner of the then-pending litigation that alleged the communications between Judge Bruce and the U.S. Attorney's Office demonstrate that the judge has a disqualifying bias under the Due Process Clause

---

[6] In identifying which communications were ex parte, the United States used the criteria of (a) a communication between an AUSA (or a USAO staff member), (b) in a pending matter over which the judge was presiding, (c) where opposing counsel was not copied on the communication. *See* Illinois Rule of Professional Conduct 3.5(b); Black's Law Dictionary 597 (1999 ed.). Excluded from those communications that the United States identified as ex parte were communications that related to matters that were appropriately ex parte (*e.g.*, scheduling appointments for criminal complaints, search warrants, and Title III materials and the provision of such materials to the judge). Aside from some exceptions, also excluded from those communications identified as ex parte were communications that related to the scheduling of an initial appearance or an arraignment in an under-seal matter.

and whether Judge Bruce erred by failing to recuse himself under 28 U.S.C. § 455(a), such that a new trial or sentencing was required. *Id.*

## IV. Special Committee Report And Judicial Council Order

Judge Bruce's communications with the USAO were the subject of two judicial-misconduct complaints before the Court of Appeals – one identified by Chief Judge Diane P. Wood and the other filed by the Federal Public Defender, Thomas W. Patton. *See* 28 U.S.C. § 351; Special Committee Report, *Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067, at 1 (May 8, 2019) ("Special Comm. Report"). Chief Judge Wood appointed a Special Committee to investigate those complaints. *See* 28 U.S.C. § 353(a); Special Comm. Report at 1. The Special Committee conducted its investigation and issued its report in accordance with the Judicial Improvements Act, and the Judicial Council of the Seventh Circuit entered an order resolving the complaints. 28 U.S.C. §§ 353(c), 354.

As stated in its report, the Special Committee "requested and reviewed document productions" from Judge Bruce, the USAO, and two paralegals in the Office, including Lisa Hopps. *See* Special Comm. Report at 1. The committee also reviewed the public defender's complaint and its attachments, and interviewed FPD Patton, Ms. Hopps, John Childress (former U.S. Attorney), Patrick Hansen (then First Assistant U.S. Attorney), and Supervisory AUSA Eugene Miller. *Id.* at 1. The committee then held a hearing, at which Judge Bruce and one of the USAO paralegals testified. *Id.*

In its report, the Special Committee observed that Judge Bruce had worked at the USAO for twenty-four years before his appointment as a district judge. Special Comm.

Report at 2. The committee acknowledged that, "since taking the bench in 2013, [Judge Bruce] frequently had ex parte communications with the Office." *Id.* at 4. The committee also noted that the Federal Public Defender's complaint "alleged that Judge Bruce [had] demonstrated a pattern "of improper ex parte communications" with the USAO and "complained about the frequency, nature, and seemingly too-comfortable tone of Judge Bruce's emails with the Office." *Id.* at 4.

Summing up the evidence before it, the Special Committee noted that it had "seen no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." Special Comm. Report at 6. In particular, the committee also noted that "the scheduling-related emails about which Mr. Patton complains do not in fact show Judge Bruce prejudging potential future motions from the defense." *Id.* at 7. The committee also said, "[N]o evidence suggested that Judge Bruce had an inappropriate relationship with anyone at the Office." *Id.* at 6 n.5. The report described measures that Judge Bruce had agreed to take to limit ex parte communications on scheduling and other ministerial matters.[7] *Id.* at 7.

Turning to the merits of the complaints, the Special Committee found, first, that "Judge Bruce's pattern of ex parte communications" violated "judicial norms" and Canon 3 of the Code of Conduct for United States Judges. Special Comm. Report at 8-9. That

---

[7] The Special Committee's report also observed that "ex parte communications were not unique to the U.S. Attorney's Office – Judge Bruce, his staff, and others often engaged the Federal Defender's Office ex parte over scheduling and ministerial matters as well. According to Judge Bruce, these communications typically happened over instant messaging because, apparently, the Central District of Illinois and the Federal Defenders share computer systems." Special Comm. Report at 8.

Canon generally prohibits ex parte communications "concerning a pending or impending matter," except "for scheduling, administrative, or emergency purposes" when required by the circumstances. *Id*. Second, the committee expressed concern that Judge Bruce's communications and their publication had negatively impacted the "appearance of propriety and fairness" on the part of Judge Bruce. *Id*. at 9-11.

In light of these findings and concerns, the Special Committee recommended that the Judicial Council: (1) publicly reprimand Judge Bruce for his ex parte communications, (2) bar the judge from handling any matters involving the USAO until September 1, 2019, and (3) order him to complete certain training. Special Comm. Report at 11. The committee believed these measures would be "appropriate to inform the public that the Council has taken disciplinary and corrective actions, to allow time for negative impressions of Judge Bruce to further recede before he again begins adjudicating the Office's matters, and to educate him on why the Urbana-courthouse culture of ex parte communications that he has described is misguided and prohibited." *Id*. The committee rejected Judge Bruce's assertion that a private reprimand would be sufficient, in light of the public disclosure of the judge's communications. *Id*. at 11-12.

The Seventh Circuit Judicial Council unanimously adopted the Special Committee's report and followed the committee's recommendations, including by publicly admonishing Judge Bruce that "his former practice of ex parte communications" violated the Code of Conduct for United States Judges. See Order & Memorandum, In re Complaints Against District Judge Colin S. Bruce, Nos. 07-18-90053 & 07-18-90067 (May 14, 2019). The Council concluded, however, that it had "identified no evidence

suggesting that Judge Bruce's ex parte contact or relationship with the [USAO] impacted his decision making in any case," such that a more serious reprimand was unnecessary. *Id*. The Judicial Council did not refer the complaints to the Judicial Conference of the United States. See 28 U.S.C. § 354(b). After September 1, 2019, Judge Bruce again began hearing cases involving the USAO, including criminal cases, although he recused himself from any cases involving certain parties, including the FPD.

## V.  The Federal Public Defender's Representation Of Petitioner

As noted, the Federal Public Defender (FPD) represented petitioner throughout the district court proceedings and sentencing. Between February 4, 2015, and October 26, 2020, there is no attorney of record for the petitioner in the court records. Nevertheless, at various points after petitioner's case was concluded, the FPD contacted him soliciting his interest in filing a § 2255 motion alleging Judge Bruce was biased against him.

In fact, after the *Nixon* emails were disclosed, FPD Thomas Patton engaged in a strategy of challenging Judge Bruce's decisions based on allegations of bias. Documents provided by the FPD, coupled with other records in this case and other cases, show that the FPD strategically and persistently attacked  Judge Bruce's conduct, with the specific goal of obtaining a litigation advantage in his cases, aided by the potential embarrassment of the federal judiciary in the Central District of Illinois and the U.S. Attorney's Office.

In October 2018, FPD Patton sent undersigned counsel a letter requesting that the United States agree to a new trial in the *Nixon* case stating, "litigating the motion will be unpleasant for the Court, the U.S. Attorney's office, and the federal court system in

16

general." Gov. App. 1-2. FPD Patton warned that "[a] hearing to dig into the details of the misconduct will be an even bigger mess," which the government could avoid by agreeing to a file a joint motion for a new trial. *Id*. At the same time that the FPD was trying to negotiate a favorable and "quiet" resolution in the *Nixon* case, FPD Patton sent a letter to Hon. James E. Shadid, then Chief United States District Judge, stating his opinion that his office "has a duty" to assist in filing post-conviction challenges based on the disclosure of Judge Bruce's emails. Gov. App. 3-5. Thus, FPD Patton expressed his desire to mount numerous challenges to Judge Bruce's prior rulings on the behalf of numerous defendants before any of those defendants expressed a similar desire or even requested representation.

In November 2018, FPD Patton sent letters to an unknown number of criminal defendants, even those, like the petitioner, the FPD no longer represented. The letter informed petitioner of the *Nixon* emails, and opined that, although the FPD had not received "any information that Judge Bruce engaged in … misconduct" specific to his case,  the petitioner had a "potentially meritorious claim" to vacate his sentence. Gov. App. 127-28. The letter explained that the emails establish Judge Bruce was biased for the government and against criminal defendants and that such bias was a structural error. *Id*. FPD Patton included a copy of the motion he filed in the *Nixon* case and encouraged petitioner to contact him "as soon as possible" if he wanted to challenge his conviction and sentence. *Id*. The FPD kept a spreadsheet of the criminal defendants they contacted and noted if they wanted to proceed with the litigation he suggested. Gov. App.125-26.

Petitioner responded on December 10, 2018, asking that FPD Patton to try to challenge his conviction for a double jeopardy claim because his was convicted of receipt and possession of child pornography. Gov. App. 129. Petitioner's letter made no mention of Judge Bruce. *Id.*

Petitioner wrote another letter in January 2019, again seeking that the FPD pursue the "double jeopardy" issue as well as a "the new law that passed of the 65%." Gov. App. 132. Petitioner's April 2019 letter to the FPD acknowledges receipt of the government's March 2019 letter indicating that no emails relative to his case were identified. Gov. App. 138. Petitioner asked if the "double jeopardy" claim could be pursued. *Id.*

In September 2019, FPD Patton entered into a tolling agreement with then U.S. Attorney for the Central District of Illinois, John Milhiser. Pursuant to this agreement, the government agreed to extend the statute of limitations for potential claims of actual bias that "clients other than Sarah Nixon may have regarding Judge Bruce's handling of their cases" until after the *Nixon* motion is litigated. Gov. App. 79-80. The agreement allowed litigants 60 days from the date the Nixon opinion was final to file a § 2255 claim alleging actual bias. *Id.* Petitioner was one of 63 criminal defendants on the FPD's list. Gov. App. 81-83.

On October 24, 2019, the Seventh Circuit issued its opinion in *United States v. Atwood*, 941 F.3d 883 (7th Cir. 2019). The appellate court found that in the context of a sentencing hearing, where the court exercises "ample discretion," a violation of the federal recusal statute, 18 U.S.C. § 455(a) was not harmless error. *Id.* at 886.

18

Shortly thereafter, FPD Patton sought concurrence from then U.S. Attorney Milhiser to expand the tolling agreement to include claims regarding a violation of the federal recusal statute. Gov. App. 96-102. In his letter, FPD Patton acknowledged the USAO was "unlikely to concede a violation of 18 U.S.C. § 455(a) warrants relief in either the § 2255 or Rule 33 new trial context" and further acknowledged that "the Seventh Circuit may find that the harmless error analysis is different in the post-conviction context than in the direct appeal context." *Id*. FPD Patton stated, "[o]bviously, a failure to recuse claim is not the same as a claim that Judge Bruce was in fact biased." *Id*. And FPD Patton urged U.S. Attorney Milhiser to agree to expand the tolling agreement. FPD Patton warned that "[i]f the tolling agreement is not amended my plan is to contact the defendants covered by the tolling agreement and explain my error in failing to preserve the *Atwood* claim. That will likely result in a large number of § 2255 motions being filed pretty quickly." *Id*. FPD Patton planned to discuss "the influx of § 2255 motions" with the judges. *Id*. The government did not agree to expand or otherwise amend the tolling agreement.

On January 28, 2020, FPD Patton informed Hon. Sara L. Darrow, Chief United States District Judge, in an email that "there will likely be a large number of 2255 motions filed in the near future." Gov.App. 103. FPD Patton further stated that he felt "compelled to quickly inform the defendants [he] told to wait" so they can promptly file a § 2255 motion. *Id*.

On January 29, 2020, FPD Patton sent a letter to petitioner informing him of the *Atwood* decision.[8] Gov. App. 140-41. In the letter, FPD Patton stated that he "counseled" petitioner to wait to file any pleading while the *Nixon* litigation was pending. *Id.* FPD Patton further stated that he did not properly preserve petitioner's right to raise a claim under § 455(a) of the recusal statute and that the statute of limitations may have run. *Id.* FPD Patton advised petitioner that the doctrine of equitable tolling applies when a defendant is misled and, in his opinion, FPD Patton "misled" petitioner. *Id.* FPD instructed petitioner to "act promptly" to "obtain the benefit of equitable tolling" and encouraged petitioner to "include this letter with your filing." *Id.* Notwithstanding the representations in the FPD's letter, the documents provided by the FPD pursuant to this Court's discovery order contain no evidence that the FPD "counseled" petitioner to wait or "misled" petitioner regarding his rights.

In fact, FPD Patton's January 2020 letter appears to have been the first communication to the petitioner since January 2019, acknowledging receipt of petitioner's December 2019 letter seeking representation on his "double jeopardy" claim. Gov. App. 131.

## VI. Petitioner's § 2255 Motion

On October 12, 2020, over five and half years after his conviction became final, petitioner filed a pro se motion to vacate his conviction and sentence under 28 U.S.C. § 2255. R. 29. Petitioner alleges that that his due process rights were violated based on the presiding judge's (Bruce, J.) improper communications with some members of the U.S.

---

[8] Based on a review of document received and filed as exhibits in other cases, this January 2020 letter appears to have been sent to every criminal defendant on the tolling agreement list.

Attorney's office for the Central District of Illinois. *Id*. at 4. Petitioner also claims that his convictions constitute double jeopardy citing an Eight Circuit decision. *Id*. at 9.

This Court appointed attorney Charles Schierer to represent petitioner and Mr. Schierer filed a supplemental motion. D.E. 10/26/2020; R. 31.

Petitioner now seeks to vacate his conviction and sentence claiming that Judge Bruce's emails show he was "actually biased against him." Pet.Br. 14-15. Petitioner further claims that a potential violation of the federal recusal statute "creates too great a risk of injustice" and in weighing the relevant factors warrants a new sentencing before a different judge. Pet.Br. 12, 16-22. Petitioner further alleges that the Federal Public Defender was ineffective for not properly preserving his rights in negotiating a tolling agreement with the government. Pet.Br. 23-24.

Petitioner also asks this Court to excuse the untimeliness of his petition, claiming the doctrine of equitable tolling applies due to Federal Public Defender Thomas W. Patton's self-confessed "serious legal error" by failing to preserve petitioner's right to claim a due process error based on Judge Bruce's alleged violation of the federal recusal statute. Pet.Br. 2-3.

The parties jointly filed a motion for discovery and expanded record on November 17, 2020. R. 30. This Court granted the parties' motion on the same day and allowed the FPD until December 8, 2020, to provide the parties with the responsive materials. D.E. 11/17/2020. The FPD was specifically ordered to disclose to the government and petitioner's counsel:

any and all materials in its possession, including, but not limited to, letters, documents, notes, recordings, communications, transcripts of conversations, memoranda, emails, or instant messages: (1) establishing that an attorney-client relationship existed between Defendant and the FPD at any time between the time Defendant's conviction became final (February 18, 2015) and he filed his Section 2255 motion (October 22, 2020), including Defendant's assent to representation by the FPD; (2) relating in any way to Judge Bruce's alleged appearance of bias and/or failure to recuse under Section 455(a) or any other statute, including any reference to the appellant's brief filed in Atwood raising these issues or the Seventh Circuit's opinion in Atwood discussing these issues, including, but not limited to, (a) how and when the FPD first considered or became aware of such a potential claim; and (b) the FPD's consideration at any time of whether to file such a claim on the behalf of any client, including Defendant; (3) relating in any way to the FPD's performance in negotiating the tolling agreement on behalf of Defendant; and (4) relating in any way to the FPD misleading Defendant into believing the FPD had properly preserved his claims, *including advising Defendant to wait to file* any pleading.

*Id.* (emphasis added).

This Court ordered that petitioner shall have 30 days from the receipt of the Federal Public Defender's responsive discovery materials to further supplement his motion and the Government shall have 60 days from the date of the petitioner's second supplemental motion to file a comprehensive response. D.E. 11/17/2020.

The parties received the Federal Public Defender's disclosure on December 23, 2020. Petitioner did not file a supplemental pleading addressing the additional discovery materials. The government's response was therefore due on March 22, 2021.[9]

---

[9] Petitioner's counsel agrees with the government's interpretation of this Court's briefing schedule that if petitioner does not file a supplemental pleading, the government has 60 days to file a response from the date petitioner's supplemental pleading could have been filed.

## ARGUMENT

### I. Legal Framework

A petitioner may avail himself of Section 2255 relief only if he can show that his sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012). Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993), *citing Scott v. United States*, 997 F.2d 340 (7th Cir. 1993).

If an error is neither jurisdictional nor constitutional, to be cognizable on collateral review, it must present "exceptional circumstances" in which a fundamental defect inherently results in a complete miscarriage of justice. *Hawkins v. United States*, 706 F.3d 820, 829 (7th Cir. 2013), citing *Hill v. United States,* 368 U.S. 424, 428 (1962).  Petitioner seeks to vacate his conviction and sentence based on the following claims:

(1) Judge Bruce's emails show he was "actually biased against him"; (Pet.Br. 12)

(2) a violation of the federal recusal statute "creates too great a risk of injustice" and warrants a new sentencing before a different judge; (Pet.Br. 12, 16-22), and

(3) the FPD was ineffective for not properly preserving his rights in negotiating a tolling agreement with the government. (Pet.Br. 24)

Petitioner argues that the interest of justice requires this Court to vacate his conviction and sentence because United States District Judge Colin S. Bruce allegedly had a

disqualifying bias against him and in favor of the prosecution. His argument is based primarily on his interpretation of e-mails that did not pertain to this case sent at other times by Judge Bruce to certain former colleagues at the U.S. Attorney's Office. A fair reading of these e-mails in context does not support petitioner's conclusion that Judge Bruce was biased against the defendant in favor of the prosecution.

Although a number of the judge's communications at issue were ex parte, they do not constitute a violation of petitioner's due-process rights. The Supreme Court has held that the Due Process Clause of the Fifth Amendment requires a fair trial before a judge with no actual bias against the defendant or with no interest in the outcome of a litigant's case. The Seventh Circuit has held that litigants are not denied due process by either the appearance of partiality or by circumstances that might lead one to speculate as to a judge's impartiality. Rather, the presumption is that judges are able to rise above any biases and biasing influences. Thus, to prove a disqualifying bias warranting a new criminal trial, the defendant, or petitioner in this context, must establish direct evidence of bias -- actual bias -- or a possible temptation on the part of the judge so severe that a reviewing court presumes an actual, substantial incentive for the judge to be biased -- presumptive bias. This petitioner cannot do.

Petitioner's argument claiming FPD Patton's alleged ineffectiveness does not meet the legal standard necessary to warrant any remedy. First, petitioner fails to meet the threshold inquiry that counsel's performance was "objectively deficient" and that counsel's strategic decisions fell below a "wide range of competent representation." *Swanson v. United States*, 692 3d at 714 (internal quotation marks omitted). Further,

petitioner fails to show that but for counsel's subpar representation, petitioner's outcome would have been different. *Id*.

Petitioner also asks this Court to excuse the untimeliness of his petition claiming the doctrine of equitable tolling applies due to FPD Patton's self-confessed "serious legal error" by failing to preserve petitioner's right to claim a due process error based on Judge Bruce's alleged violation of the federal recusal statute. Pet.Br. 2-3. Because petitioner's claims are either, 1) untimely; 2) fail to establish that Judge Bruce was actually biased against him; 3) fail to establish a cognizable claim under § 2255; 4) fail to establish the outcome would have been different if FPD Patton's representation was competent, and as argued *supra*; and 5) petitioner waived his right to collaterally attack his conviction and sentence, this Court should deny his motion.

### A.  Timeliness and Equitable Tolling

A one-year period of limitation applies to motions that fall under § 2255. *Godoski v. United States*, 304 F.3d 761, 762-64 (7th Cir. 2002). The limitations period runs from that latest of: (1) the date on which the judgment of conviction becomes final; (2) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (3) the date on which the facts supporting the claim or claims

presented could have been discovered through the exercise of due diligence.[10] 28 U.S.C. § 2255(f).

As to the first possible limitations period, finality to petitioner's conviction and sentence attached on the date when the time for filing a notice of appeal expired, February 18, 2015. *Clay*, 537 U.S. at 525. Therefore, petitioner was required to file his motion under 28 U.S.C. § 2255 no later than February 18, 2016, one year after the judgment became final.

### 1. Claim that Judge Bruce was actually biased

The claim that Judge Bruce was biased based on the discovery of emails in *United States v. Sarah Nixon*, Case No. 15-20057 (C.D.Ill.) and the subsequent investigation and disciplinary proceedings that ensued is timely. Since petitioner was included in the government's tolling agreement with the FPD, he had until October 17, 2020 (60 days after the *Nixon* ruling), to file his motion. Gov. App. 79. Petitioner's claim of actual bias, filed within that timeframe, is therefore timely.

### 2. Claim that Judge Bruce's failure to recuse himself under § 455(a) warrants a new trial and sentencing

Since there are no ex parte emails involving petitioner, his appearance of bias claim relies on emails in other cases, specifically *Nixon*. On October 25, 2018, the FPD, who represents Sarah Nixon, filed (in *Nixon*) a lengthy and detailed amended motion alleging Judge Bruce's emails showed a "pattern of bias" in favor of the United States in criminal

---

[10] The statute lists one other possible date that the limitations period may begin, but it does not appear to apply in this case.

cases. *See Nixon*, Case No. 15-CR-20057. (R. 173) Nixon's amended motion attached, in a public filing, many of the same emails asserted as the basis for petitioner's claim here. *Id.* The ex parte emails involving Judge Bruce and his temporary removal from hearing criminal cases were widely publicized in August 2018.[11] In other words, by no later than October 25, 2018, the exercise of due diligence would have alerted anyone that Judge Bruce engaged in ex parte communication members of the USAO, including, in some limited instances, about matters involving pending cases, and that at least one defendant was using that to assert "pattern of bias" claims. This is particularly so for petitioner who was housed locally at FCI Pekin. Gov. App. 127, 130, 131, 133, 135.

Petitioner's also learned about Judge Bruce's emails through FPD Patton's November 2018 letter to him detailing and his response confirming he wanted to proceed. Gov. App. 127-28. Therefore, under § 2255(f)(4), this claim should have been filed no later than November 2019 and is untimely.

Petitioner claims, however, that the doctrine of equitable tolling applies because FPD Patton misled him. There is no evidence in the records provided by the FPD to show, however, that FPD ever counseled petitioner to wait to file his § 2255 motion. In fact, between December 2018, when petitioner first expressed an interest in the FPD representing him in his § 2255 and FPD Patton's January 2020 letter, there does not appear

---

[11] https://chicago.suntimes.com/2018/8/21/18315466/us-judge-off-illinois-corruption-kidnapping-cases-after-emails;
https://apnews.com/article/77b87d32563d4288adce89b1f39b7755;
https://chicago.cbslocal.com/2018/08/22/federal-judge-removed-criminal-cases-inappropriate-emails/; https://www.news-gazette.com/news/ judge-in-accused-kidnapper-s-trial-removed-from-all-criminal/article_cfbc459d-529b-55e4-85b9-cc00818c5d53.html (published in August 2018, *last accessed February 1, 2021*).

to have been any communication from FPD Patton to petitioner, with the exception of a one paragraph letter dated January 4, 2019, that acknowledged petitioner's letter, and promised to "keep [him] informed as to the status of [his] case" and "send [him] copies of any documents that will be filed" on his behalf. Gov. App. 129, 131, 140.

Petitioner sat on his hands knowing that he had to timely file his § 2255 claims. He failed to do so, and in biding his time, he flunked diligence. *Clarke v. United States,* 703 F.3d 1098, 1101 (7th Cir. 2013).

### 3. Claim that FPD Patton was ineffective

Petitioner claims that FPD Patton was ineffective for not preserving his rights. Petitioner learned of FPD Patton's alleged "serious legal error" when FPD Patton told him by letter in January 2020, therefore this claim is also timely.

### B. Merits

Petitioner claims that the interest of justice requires a new trial because Judge Bruce allegedly had a disqualifying bias against him and in favor of the prosecution. His argument is based on his interpretations of e-mails that did not pertain to this case sent at other times by Judge Bruce to certain former colleagues at the U.S. Attorney's Office. Because petitioner has not and cannot show actual bias, his motion should be denied.

The Due Process Clause of the Fifth Amendment "requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations and quotation marks omitted). "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok,*

520 U.S. 641, 647 (1997) (citations omitted). In other words, a biased judge constitutes a structural error that "deprive[s] [a] defendant[] of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *United States v. Harbin*, 250 F.3d 532, 543 (7th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 8-9 (1999)) (quotation marks and ellipses omitted).

"[A] litigant is not denied due process by either the appearance of partiality or by circumstances which might lead one to speculate as to a judge's impartiality." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); *see Suh v. Pierce*, 630 F.3d 685, 692 (7th Cir. 2011) (distinguishing the broader recusal standard under 28 U.S.C. § 455 that requires a judge to recuse himself whenever "his impartiality might be questioned" from the standard for proving a due process violation). Instead, "[t]he general presumption is that judges are honest, upright individuals and thus that they rise above biasing influences." *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) (citations omitted). "To prove a disqualifying bias, a petitioner must offer either direct evidence or 'a possible temptation so severe that [a reviewing court] might presume an actual, substantial incentive to be biased,'" *id.* (quoting *Del Vecchio*, 31 F.3d at 1380), and the actual or presumed bias must be "in [the defendant's] own case." *Bracy*, 520 U.S. at 905.

Almost every bias case before the Supreme Court where a due-process violation has been found has involved presumptive, not actual, bias. There are three situations in which the Court has found presumptive bias: (1) the judge had a direct, personal, or substantial pecuniary interest in the outcome of the case; (2) the judge had been the target

of personal abuse or criticism from the party before him; and (3) the judge had the dual role of investigating and adjudicating disputes and complaints. *See, e.g., Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 824–25 (1986) (holding that the justice's interest in the case was "direct, personal, substantial, and pecuniary" and concluding that his participation in the case "violated appellant's due process rights") (quotation marks, citation, and brackets omitted); *Withrow v. Larkin,* 421 U.S. 35, 47 (1975) (reasoning that "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable" in cases in which the judge "has been the target of personal abuse or criticism from the party before him") (citations omitted); *In re Murchison,* 349 U.S. 133, 139 (1955) (holding that it was a violation of due process for one adjudicator to preside as the grand jury judge and trial judge for the same defendants); *see also Del Vecchio*, 31 F.3d at 1373-74 (discussing Supreme Court bias cases).

## 2.  Ex parte e-mail communications

Petitioner claims that the emails between Judge Bruce and a U.S. Attorney's Office employee demonstrate a pattern of bias in favor of the government. Pet. Br. 14. Email communication is ubiquitous in today's legal world, including by judges. Unfortunately, e-mails are frequently prepared and sent quickly, without review. They often contain a familiar or jovial tone, which can result in them being misconstrued and taken out of context, especially by those who are not parties to the conversation.

None of the ex parte and potentially ex parte communications related to Petitioner's case. Petitioner nonetheless contends that the communications collectively demonstrate a systemic bias in favor of the United States, and thus, against him. Pet.Br. at 15. The

United States disagrees. The e-mails do not, collectively, or individually, demonstrate actual bias or a possible temptation so severe as to overcome the presumption that Judge Bruce rose above any biasing influences. *Franklin*, 398 F.3d at 959. This is particularly true given that the ex parte communications largely pertained to administrative matters.

In his motion, petitioner highlights communications (or series of communications) in other cases that he contends demonstrate a disqualifying bias in favor of the United States. None of these communications establishes the disqualifying bias alleged. Petitioner's argument that these communications establish Judge Bruce's disqualifying bias, when taken into context, fare no better than his other claims regarding cases in which he was not involved.

### a. *United States v. Sarah Nixon*, No. 15-CR-20057 (Bates Nos. 2539-2548)

The December 2016 Email Exchange in the *Nixon* case involved a paralegal who was not part of the *Nixon* trial team inquiring why Judge Bruce did not attend the retirement reception for outgoing U.S. Attorney James Lewis. In his response, Judge Bruce explained that he was in trial and expressed his views of defendant Nixon's testimony, the prosecution's cross-examination, and the probability of an acquittal based on the proceedings themselves. This is significant because, in the context of the recusal statute, *see* 28 U.S.C. § 455(b)(1) (personal bias or prejudice), the Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994);

*see Del Vecchio*, 31 F.3d at 1370-72, 1379 (citing *Liteky* in support of its due process analysis). Thus, the question is not whether a presiding judge has reached such opinions during the course of the proceedings, but whether the judge can "discipline[] [himself] to conduct fair proceedings and make impartial rulings despite the opinion one inevitably forms during the proceedings." *In the Matter of Huntington Commons Assoc.*, 21 F.3d 157, 158 (7th Cir. 1994) (quotation marks and citation omitted).

Unfortunately, Judge Bruce incautiously expressed his views to a prior colleague in the U.S. Attorney's Office who was not part of the prosecution team. Regardless, his reaching such opinions during the course of the trial, based on the evidence introduced and events that occurred during the trial, did not rise to the level of disqualifying bias. If judges forming opinions during the course of criminal trials concerning the veracity of witnesses, the performance of attorneys, and the probability of an outcome constitutes judicial bias in violation of the Due Process Clause, there is likely no criminal proceeding that could pass constitutional muster. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943) (quoted by *Liteky*, 510 U.S. at 551).

In its ruling, the Court in *Nixon* agreed that there was no evidence to support a finding of actual bias against Nixon or any other litigant. *United States v. Nixon*, No. 15-CR-20057-JES-JEH, 2020 WL 4820708, at *20 (C.D.Ill. Aug. 19, 2020).

### b.  *United States v. Jason Gmoser*, No. 14-CR-20048 (Bates No. 1985)

The context of Judge Bruce's February 1, 2016, reply email to AUSA Peirson—"My bad. You're doing fine. Let's get this thing done," Bates No. 1985—demonstrates that the judge was not aligning himself with the government or against Mr. Gmoser. Judge Bruce's comments came in response to AUSA Peirson's email (on which defense counsel was copied) in which she apologized for any confusion she may have created at the pretrial conference earlier that day. At that hearing, Judge Bruce alternatively complained and expressed confusion regarding whether AUSA Peirson had filed the required trial documents (she had). *Id.*; Gov. App. 121-23. Earlier, during a November 6, 2015, pretrial hearing, Judge Bruce was also critical of AUSA Peirson's alleged failure to determine the availability of the government's expert witness for the November 2015 trial setting. Gov. App. 107-09. The judge also repeatedly stated that he was "unhappy" that government counsel was affecting his trial calendar. Gov. App. 107, 114, 116-17.

Taken together, these events serve to explain Judge Bruce's February 1, 2016, ex parte apology ("My Bad. You're doing fine.") and his interest in getting the case tried on the trial date ("Let's get this thing done."). He was not aligning himself with the government or government counsel against a defendant, as petitioner suggests.

In denying the defendant's motion for new trial, the Court in *Gmoser* agreed that "defendant failed to produce evidence of actual bias or a possible temptation so severe that actual bias may be presumed, and for this reason his due process claim must be denied." *United States v. Gmoser*, No. 14-CR-20048-JES, 2020 WL 4756774, at *14 (C.D.Ill. Aug. 17, 2020).

### c. *United States. v. Shawn Shannon*, No. 18-CV-2233 (Bates No. 2690-2694)

On September 19, 2018, the U.S. Attorney's Office disclosed to defendant, via counsel, an email exchange between Paralegal Specialist Staci Klayer and United States District Judge Colin S. Bruce. In this email string (April 1-4, 2017), a probation officer informed a number of addressees—including Judge Bruce, Urbana Branch Supervisor AUSA Eugene Miller, Ms. Klayer, clerk's office personnel, the magistrate judge, and another district court judge—that the probation office would be unavailable for hearings on September 11 and 12, 2017. Judge Bruce, replying to all of the addressees, stated, "Shawn Shannon re-sentencing set for September 11. Nice." Bates No. 2690, 2691 (duplicate emails). Ms. Klayer then replied solely to Judge Bruce, writing, "Sounds like the probation officer assigned to this case needs to stay here and work," and Judge Bruce responded, "Yep. Don't think its [sic] moving……" *Id.* at 2692-94.

While the judge telling Ms. Klayer that he was not going to move the sentencing hearing was an ex parte communication since it pertained to a pending case and defense counsel was not copied, the argument that this communication exhibits bias in favor of the government is without support. Instead, the communication reflects that the judge was unwilling to be flexible with respect to a probation officer's training requirements by rescheduling a sentencing hearing. It falls well short of evidence of a judge seeking to give the government a leg up for a sentencing hearing—i.e., a hearing that as of April 4, 2017, was still more than five months away.

In its ruling denying Shannon's § 2255 motion, the Court agreed, "it is far more likely that a judge would not want to move a scheduled hearing that neither party had

34

requested to move." *Shannon v. United States*, No. 18-CV-2233-JES, 2020 WL 6947421, at

*15 (C.D.Ill. Nov. 25, 2020). The Court further found no evidence any of the emails or the

comments Judge Bruce made at Shannon's sentencing that showed he was biased against

Shannon. *Id*.

### 2. Other communications

Contrary to petitioner's characterization, the other emails are not ex parte. Not every

communication between a judge and a litigant is ex parte; a communication is only ex

parte if (a) the communication was between the judge and only one side or litigant, (b) in

a pending matter over which the judge was presiding, and (c) where opposing counsel

was not included on the communication. *See* Illinois Rule of Professional Conduct 3.5(b);

<u>Black's Law Dictionary</u> 597 (1999 ed.). Many of the communications that involved Judge

Bruce and at least one member of the U.S. Attorney's Office reveal that the judge

maintained a degree of friendship with his former colleagues, including former U.S.

Attorney James Lewis and Paralegal Specialist Staci Klayer, but do not involve matters

over which the court was presiding.[12] The relationships that Judge Bruce maintained with

various members of the U.S. Attorney's Office after his appointment to the bench—while

---

[12] Additionally, although not reflected in the communications, Judge Bruce maintained a
friendship with John Childress, who served as an AUSA, Criminal Chief, First Assistant, and
United States Attorney. There were two waiver/filing/plea cases over which Judge Bruce
presided that involved documents prepared under AUSA Childress's signature. *See* Dockets,
*United States v. Ashley Miller*, No. 17-CR-20015 (R. 1, 4) & *United States v. Kami Miller*, No. 17-CR-
20042 (R. 1, 4). In each case, AUSA Eugene Miller appeared for the United States at the
waiver/filing/plea and sentencing hearings. Additionally, government pleadings were signed
by AUSAs under Mr. Childress's official capacity title of United States Attorney between
December 2017 and October 2018. The communications between Mr. Childress and Judge Bruce
are found at Bates Nos. 279, 280, 367, 368, 2145, and 2148-149.

at times involving informal dialogue—do not constitute a disqualifying bias. As the Seventh Circuit has recognized in the context of the "appearance of partiality" rule of 28 U.S.C. § 455(a):

> In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases.

*United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985); *see also Dyas v. Lockhart*, 705 F.2d 993, 995-97 (8th Cir. 1983) (in a capital murder case, holding there was no structural error upon which bias would be presumed even though the trial and sentencing judge was the uncle of the lead prosecutor and father of the two assistant prosecutors who participated in the case).

Nothing in petitioner's motion suggests how any purported appearance of impropriety, based on Judge Bruce's background as a prosecutor, had the slightest impact on trial proceedings. Such bias is not imputed to a judge due to such a background. Instead, the law presumes that regardless of their personal backgrounds, judges are presumed to "rise above" potential biasing influences.

> Judges are human; like all humans, their outlooks are shaped by their lives' experiences. It would be unrealistic to suppose that judges do not bring to the bench those experiences and the attendant biases they may create. A person could find something in the background of most judges which in many cases would lead that person to conclude that the judge has a

36

"possible temptation" to be biased. But not all temptations are created equal. We expect—even demand—that judges rise above these potential biasing influences, and in most cases we presume judges do.

*Del Vecchio*, 31 F.3d at 1372 (citing *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)). The record here is void of any indication that the court favored one side or another at any point during the proceedings.

A review of the remaining e-mail communications between Judge Bruce and some of his former colleagues do not reveal any bias against the defendant, or any defendant, for that matter. They also do not reveal any systematic bias in favor of the prosecution. Instead, as might be expected, they demonstrate that Judge Bruce made positive comments to some former colleagues and negative comments about other former colleagues. *See, e.g.,* Bates 668, 212. Unfortunately, as was revealed in the *Nixon* e-mail, it was not uncommon for Judge Bruce to make negative comments about former colleagues to other former colleagues. A fair reading of these e-mails reveals that Judge Bruce may have been biased *against* some of the prosecutors who appeared before him, including the prosecution team in this case, but not biased in their favor.

For example, Judge Bruce forwarded an opinion he wrote criticizing AUSA Peirson to U.S. Attorney Lewis, Bates Nos. 1817-24; criticized AUSA Peirson's conduct to her supervisor, Bates No. 3721-22; and criticized her in e-mails to other members of the U.S. Attorney's Office. *See, e.g.,* Bates Nos. 133, 145, 198, 203, 209. While Judge Bruce sent a friendly e-mail forwarding an article to AUSA Miller, *see, e.g.,* Bates Nos. 743-51, he also sent e-mails to others that contained critical comments regarding AUSA Miller. *See, e.g.,*

Bates Nos. 133, 145, 209, 212. Along the same vein, Judge Bruce sent friendly e-mails to former AUSA Jason Bohm, *see* Bates Nos. 49, 54, 58, 95, 200, 205 & 569-71, but was uncomplimentary of him in an e-mail to another former colleague. *See* Bates No. 212.

In fact, even though Judge Bruce had numerous friendly communications with U.S. Attorney Lewis, *see, e.g.,* Bates Nos. 225-30, 227, 245, 1026, 1111, on at least one occasion, he made a comment to another person that was unflattering to U.S. Attorney Lewis. *See* Bates No. 668. In his e-mails, Judge Bruce also disparaged other AUSAs, including some, who were former colleagues, *see, e.g.,* Bates Nos. Nos. 37 (describing an AUSA as "a man without honor"); 2423 (complaining that an AUSA had "less skill than a third year law student," and was "often not prepared"); or the U.S. Attorney's Office in general. *See, e.g.,* Bates Nos. 1697 ("The Urbana USAO is going downhill"), 1814 ("lots of problems in the USAO, caused by the usual suspects"). The judge's communications do not show bias in favor of the government, as petitioner alleges, but rather criticisms of the U.S. Attorney's Office, and in particular, certain attorneys in the USAO.

At most, the communications between Judge Bruce and some of his former colleagues reveal that Judge Bruce maintained a degree of personal relationship or friendship with some of them, but not with others. In addition to the e-mails referenced above, Judge Bruce shared friendly, non-case related e-mails regarding a variety of subjects with various former USAO colleagues.

In short, the relationships that Judge Bruce maintained (or purported to maintain) with certain members of the U.S. Attorney's Office—even those that included off-putting dialogue—do not overcome the strong presumption that the judge held the proper

balance between the government and petitioner. Consistent with the law, the government presumes that Judge Bruce was able to "rise above" the "biasing influences" of his personal views of some of his former government colleagues, including trial counsel in the instant case. *Franklin*, 398 F.3d at 959.

### 3. The special committee's report and the judicial council's order foreclose any finding of actual bias

The Special Committee's report and the Judicial Council's order in this matter refute petitioner's assertion of actual bias on the part of Judge Bruce. The report described Judge Bruce's ex parte communications with the USAO in detail, yet the committee found "no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party," *id*. at 6, and the Judicial Council concluded, upon reviewing the committee's report, that there was "no evidence suggesting that Judge Bruce's ex parte contact or relationship with the [USAO] impacted his decision making in any case." *See* Order & Memorandum, *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067 (May 14, 2019). This precludes any finding of "actual bias" as alleged in the petition.

Although petitioner was not a party to the Special Committee proceedings, every court that has examined this issue and all the communications involving Judge Bruce has agreed with the Special Committee's results and consistently held there was no evidence to show that Judge Bruce was biased against criminal defendants as a whole or the defendants in those cases. *Shannon v. United States*, No. 18-CV-2233-JES, 2020 WL 6947421 (C.D.Ill. November 25, 2020); *United States v. Thomas*, No. 18-CV-2032-RM, 2020 WL

759418, (C.D.Ill. Feb. 14, 2020); *United States v. Gmoser*, No. 14-CR-20048-JES, 2020 WL 4756774 (C.D.Ill. August 17, 2020), *United States v. Nixon*, No. 15-CR-20057-JES-JEH, 2020 WL 4820708 (C.D.Ill. August 19, 2020). Petitioner can only succeed if he could establish that the information to which he points – collectively the entirety of the documented communications between Judge Bruce and the United States Attorney's Office –- is evidence of a disqualifying bias that overcomes the presumption that the judge presided over his trial fairly. He cannot.

### C. Petitioner's Claim is not Cognizable Under Section 2255

Petitioner's claim of judicial misconduct and bias is not cognizable under § 2255. As detailed above, the Special Committee of the Seventh Circuit has already found that Judge Bruce did not display any actual bias in any of his cases. *In re Complaints Against Dist. Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council May 14, 2019); *see also United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019) ("The Judicial Council found no evidence that Judge Bruce's improper communications actually affected his decision in any case . . .").

Thus, the only viable claim for petitioner would be a claim of appearance of bias. *See Atwood*, 941 F.3d at 886. The Seventh Circuit has held, however, that the mere appearance of bias is not a constitutional error, *i.e.,* a due process violation:

> The dissents treat the Supreme Court's "appearance of justice" language . . . as holding that the due process clause requires judges to recuse themselves based solely on appearances. But those cases present no such holding; the Supreme Court's mention of "appearance of justice" certainly does not compel reversal on due process grounds if a federal judge decides—based on a personal view of judicial protocol—that it looked bad

for a state judge to try a case. Such a pure appearance approach would be hard to reconcile with the bevy of Supreme Court precedents on the issue of recusal which do not address the "appearance of justice." Appearances are usually for the eyes of the beholder. Years after whatever appearance there was has disappeared, a reviewing judge is left not with appearance but with hindsight speculation. That will not suffice as a basis for overturning a conviction. The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance. Instead, the Supreme Court simply uses the "appearance of justice" language to make the point that judges sometimes must recuse themselves when they face possible temptations to be biased, even when they exhibit no actual bias against a party or a cause.

In short, bad appearances alone do not require disqualification. Reality controls over uninformed perception. Del Vecchio cites no case in which the Supreme Court has overturned a verdict on due process grounds based on a mere appearance of bias.

*Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1371–72 (7th Cir. 1994) (citations omitted) (footnote omitted).

The Second, Third, Fifth, Sixth, and Eleventh Circuits all agree with the Seventh Circuit that the mere appearance of bias does not necessarily warrant habeas relief under the Due Process Clause. *See Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008) (citing *Aetna v. Lavoie*, 475 U.S. 813, 820–21 (1986) for the proposition that "the Supreme Court has indicated that a statute requiring the disqualification of a judge based on bias or prejudice `would not be [a] sufficient basis for imposing a constitutional requirement [for disqualification] under the Due Process Clause.'"); *Davis v. Jones,* 506 F.3d 1325, 1336 (11th Cir. 2007) ("the federal recusal statute establishes stricter grounds for disqualification than the Due Process Clause"); *Johnson v. Carroll*, 369 F.3d 253, 254 (3d Cir. 2004)

(reversing trial court grant of habeas relief because not "clearly established" that the mere appearance of bias violates the Due Process Clause); *United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990) (observing that Section 455 "and the Due Process Clause are not coterminous"); *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989) (Section 455's "appearance of impropriety standard" is not "mandated by the Due Process Clause");. *Cf. Gerber v. Veltri*, 702 F. App'x 423, 433 (6th Cir. 2017) (finding ex parte discussions between judge and counsel did not warrant relief because "the Code of Conduct for United States Judges does not establish grounds for disqualification under the Due Process Clause").

Finally, a non-jurisdictional, non-constitutional error of law is not a basis for collateral attack under 28 U.S.C. § 2255 unless the error is "a fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962); *see also United States v. Addonizio*, 442 U.S. 178, 185 (1979); *Stone v. Powell*, 428 U.S. 465, n.10 (1976) ("Even those nonconstitutional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constituted a fundamental defect which inherently results in a complete miscarriage of justice.") (citation and quotation marks omitted). The Seventh Circuit has held, for example, that an obvious advisory guideline sentencing error does not rise to this standard, even though the judge might have imposed a lighter sentence had the judge calculated the applicable guidelines sentencing range correctly. *Hawkins v. United States*, 724 F.3d 915, 917 (7th Cir. 2013).

As *Hawkins* stressed, just because an error may be raised on direct review does not mean it may be raised on collateral attack due to the strong federal interest in the finality of sentences:

> Our panel opinion does not deny that the district judge had committed an error that would be corrigible on direct review. But we found the social interest in a belated correction of the error outweighed by the social interest in the finality of judicial decisions, including sentences. . . . Finality is an institutional value and it is tempting to subordinate such a value to the equities of the individual case. But there are dangers, especially if so vague a term as "fairness" is to be the touchstone.

> Judicial systems that ignore the importance of finality invite unreasonable delay in the disposition of cases. . . . [W]e have to worry about delay in our federal judicial system as well, because of the difficulty of filling federal judicial vacancies and the increasing complexity of federal cases, which increases the time required for deciding them. Such costs must be kept in mind in deciding how generously to allow postconviction retraction of sentences. Fairness to victims of errors in guidelines calculation that might or might not have lengthened a sentence (or shortened it for that matter, thus conferring a windfall on the defendant) must be balanced against the harm to victims of judicial delay brought about by judges' neglect of the social interest in judicial finality. Furthermore, as the Supreme Court explained in *Teague v. Lane*, 489 U.S. 288, 310, 109 S. Ct. 1060, 103 L.Ed.2d 334 (1989) (citations omitted), "the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, for it continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards" (emphasis in original; citation omitted). In our case, it's the federal government rather than the states that have to marshal those resources. And the procedural error is in sentencing rather than at trial. But the point is the same—it's costly for government to have to defend sentences and resentence defendants long after the original sentences were imposed.

*Id.* at 918–19.

43

Petitioner cites to no authority –– and the United States has not found any –– for the proposition that alleged judicial misconduct of this nature constitutes a fundamental defect that inherently results in a complete miscarriage of justice. In fact, such a proposition would result in criminal defendants searching for any possible misconduct by the presiding judge, regardless of any actual effect on their case, to allege as grounds for overturning their convictions or sentences long after the fact. This is not and should not be the law.

### 1.  The *Williams*, *Atwood* and *Orr* opinions do not advance petitioner's claim

Petitioner relies on the appellate court opinions in *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020), *United States v. Atwood*, 941 F.3d 833 (7th Cir. 2019), *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020). Procedurally dissimilar to the instant case, these cases involve alleged violations of the federal recusal statute, 28 U.S.C. 455(a), on direct appeal.

In the *Williams* case, Judge Bruce presided over the defendant Randy Williams's June 2018 armed robbery trial. *Williams*, 949 F.3d at 1058. Williams's case was subsequently reassigned to another judge. Williams's case was reassigned to now-Chief Judge Darrow after Judge Bruce's ex parte emails with the U.S. Attorney's Office became public, and Judge Darrow then presided over Williams's sentencing hearing. *Id.* Additionally, none of Judge Bruce's ex parte emails pertained to Williams's case. *Id.* at 1059.

On appeal, Williams argued in relevant part that Judge Bruce's ex parte communications with the office violated the federal recusal statute, 28 U.S.C. § 455(a), warranting a new trial. *Williams*, 949 F.3d at 1059. The statute provides that "[a]ny justice,

judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." § 455(a).

The Seventh Circuit noted the government's concession that there had been a statutory violation but found the error to be harmless following an examination of the three factors articulated by the Supreme Court in *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988): "(1) 'the risk of injustice to the parties in a particular case,' (2) 'the risk that the denial of relief will produce injustice in other cases,' and (3) 'the risk of undermining the public's confidence in the judicial process.'" *Williams*, 949 F.3d at 1063 (quoting *Liljeberg*, 486 U.S. at 864).

The Seventh Circuit also differentiated the *Williams* decision from its recent ruling in *Atwood*, where it remanded the defendant's case for resentencing in light of the ex parte issue. *Williams*, 949 F.3d at 1064. In *Atwood*, the defendant had entered a guilty plea and Judge Bruce had presided over his sentencing hearing, whereas in *Williams*, the defendant was found guilty by a jury. *Id*. The distinction "matter[ed] because judges generally have more discretion over sentencing than the outcome of a jury trial." *Id.* The "open-endedness of the [18 U.S.C.] § 3553(a) factors" at sentencing "the risk that a judge's personal biases will influence or appear to influence the sentence he imposes." *Id.* (quoting *Atwood*, 941 F.3d at 885).

In the *Orr* decision, the Seventh Circuit found that Judge Bruce's "close discretionary" decisions during Orr's trial significantly prejudiced the defendant. *Orr*, 969 F.3d at 741. The appellate court quickly dismissed the impact of Judge Bruce's pretrial ruling regarding Orr's motion to suppress, finding "no reasonable district court would have

reached a different result." *Id*. at 739. But in examining Judge Bruce's ruling regarding the admissibility of Orr's drug dealing as motive evidence under Fed. R. Evid. 404(b), and the admission of Orr's prior conviction for the drug dealing, the appellate court found Judge Bruce exercised "substantial discretion." *Id*. at 740.

In weighing the *Liljeberg* factors, two favored overturning Orr's verdict, the brevity of the trial and the admission of "particularly consequential" evidence that "bolstered the prosecution's case, which rested on circumstantial evidence and credibility calls." *Orr*, 969 F.3d at 742.

Nevertheless, petitioner cannot prevail here because a potential statutory violation of the federal recusal statute is not a due process violation warranting relief under § 2255. *Williams*, 949 F.3d at 1061 (holding that the due process clause does not require recusal or a new trial unless there is evidence of "either actual bias, or a possible temptation so severe that we might presume an actual, substantial incentive to be biased.")(quoting *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1380 (7th Cir. 1994) (en banc)). The court observed that "a limited set of circumstances" meets this standard –- specifically, "actual bias"; a judge's earlier "significant, personal involvement as a prosecutor . . . regarding the defendant's case"; or "a financial incentive in the case's outcome." *Williams*, 949 F.3d at 1061. Another court addressing a § 455(a) claim and these same facts found that "a petitioner may avail himself of § 2255 relief only if he can show that there are 'flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude or result in a complete miscarriage of justice.'" *Shannon v. United States*, No. 18-CV-2233-JES, 2020 WL 6947421, at *16 (C.D.Ill. Nov. 25, 2020) (citing *Boyer v. United States*, 55 F.3d

46

296, 298 (7th Cir. 1995), *cert. denied*, 516 U.S. 904, 116 S. Ct. 268, 133 L.Ed.2d 190 (1995). Petitioner can obtain a new trial and sentencing hearing only by proving a "structural error," but since petitioner cannot prove actual bias there is no structural error. A "biased trial judge" is such an error, but a mere appearance of bias is not. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1504 (2018).

### 2. The *Liljeberg* factors weigh against petitioner

Through the lens of the *Williams, Atwood,* and *Orr* opinions, even if petitioner could raise a non-constitutional claim through this § 2255 petition, this Court should likewise find that although a statutory violation occurred, the error was harmless as to petitioner. An examination of the *Liljeberg* factors is again instructive. First, the risk of injustice to the petitioner in this particular case is low. *Liljeberg*, 486 U.S. at 864. Like Williams, none of Judge Bruce's emails involved petitioner or his case. Further, the record before the court lacks any evidence that the USAO had improper influence on the outcome of petitioner's case. *Williams*, 949 F.3d at 1064.

Petitioner pled guilty and admittedly, Judge Bruce exercised his discretion in sentencing him, but there is no evidence that Judge Bruce abused his discretion in imposing petitioner's sentence, nor were any of Judge Bruce's evidentiary rulings a "close discretionary call." *Orr,* 969 F.3d at 742. Petitioner withdrew the only objection to the PSR and thus the guidelines range was uncontested. Judge Bruce's adoption of the uncontested PSR is not a heavy discretionary call. Petitioner fails to explain why or how Judge Bruce's ruling was improper, particularly when he did not object to the findings in the district court nor did he appeal them. The court's findings were not clearly erroneous,

and supported the pattern of abuse enhancement as a matter of law. Thus, petitioner's claim is without merit.

Finally, Judge Bruce sentenced petitioner in the middle of the guidelines range. A sentence within a properly calculated guidelines range is presumptively reasonable. *United States v. Adams*, 879 F.3d 826, 829 (7th Cir. 2018). A sentencing court is "perfectly entitled to accept the penal philosophy embodied in the current [child-exploitation] guideline and was not obligated to explain why she chose to do so." *United States v. Schmitz,* 717 F.3d 536, 542 (7th Cir. 2013). Given the egregiousness of petitioner's conduct, it is unlikely that any reasonable jurist would have concluded otherwise.

Additionally, this Court should consider the risk of injustice to the government if a new sentencing is granted. While the burden of another sentencing hearing is not tremendous, this Court should nevertheless consider the equities of taxing an already heavy judicial docket with an additional hearing when petitioner can point to no legal error in his first hearing.

Second, as discussed in *Williams* and *Orr*, the "risk that denial of relief will produce injustice in other cases" is minimal. *Liljeberg*, 486 U.S. at 864. This Court's examination should mirror the *Williams* analysis: the thorough Special Committee investigation and report; related public Judicial Council opinion; public reprimand of Judge Bruce; removal of Judge Bruce from criminal cases for a period of time; and administrative changes committed to by Judge Bruce all "lean toward denying [petitioner's] requested relief." *Williams*, 949 F.3d at 1065; *Orr*, 969 F.3d at 741.

Finally, there is little "risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. And despite the level of discretion a sentencing judge has, there is no indication that Judge Bruce was biased in arriving at a reasonable sentence. Petitioner does not point to any of Judge Bruce's comments at his sentencing hearing that show bias for or against either party. Further, it is hard to fathom that another court would depart from the guidelines range given petitioner's conduct.

As in *Williams*, to vacate petitioner's sentence based purely on the appearance of bias, also risks a loss of public confidence in the judicial process. *Williams*, 949 F.3d at 1065. Accordingly, in this case, the public's interest in finality outweighs any interest in the public appearance of impartiality.

In sum, although a reasonable person might question Judge Bruce's impartiality, the *Liljeberg* factors counsel against vacating the sentence.

## A. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel may be brought in a motion pursuant to 28 U.S.C. § 2255. To prevail on such a claim, however, a petitioner must show that his attorney's performance was objectively unreasonable and that such performance prejudiced the petitioner. *See, e.g., Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 446 U.S. at 690. The court's examination of an ineffectiveness of counsel claim is "'highly deferential' to counsel, presuming reasonable

judgment and declining to second guess strategic choices." *Valenzuela v. United States,* 264 F.3d 694, 698 (7th Cir. 2001), quoting *Strickland*, 466 U.S. at 689.

To determine whether the defendant has met the performance prong of *Strickland*, we "consider the reasonableness of counsel's conduct in the context of the case as a whole, viewed at the time of the conduct. There is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Id.*, citing *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998).

With respect to the prejudice prong, the defendant must "be able to demonstrate that the complained of deficiency resulted in . . . [a] 'reasonable probability' that in the absence of error the result of the proceedings would have been different, and [that the proceeding] was fundamentally unfair or unreliable." *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052). Absent a sufficient showing of both error and prejudice, a petitioner's claim must fail. *United States v. Delgado*, 936 F.2d 303, 311 (7th Cir. 1991).

It "is the rare exception, not the general rule" for a petitioner to have a valid ineffective assistance of counsel claim requiring the granting of a § 2255 motion. *Marrero v. United States,* 2007 WL 914313 *1 (N.D.Ill. March 21, 2007); *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). Furthermore, relief under § 2255 is an extraordinary remedy "because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) *citing Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006).

### 1. The FPD was not Ineffective

Petitioner claims that the FPD was ineffective for failing to include him in the tolling agreement with the government regarding actual bias claims. Pet. Br. 24. Petitioner was included in the agreement and as such benefitted from the government's agreement to enlarge the timeliness of the instant petition. Gov. App. 79-83.

Petitioner also argues that failing to secure a tolling agreement with the government that included an appearance of bias claims was ineffective. Pet. Br. 24. The FPD could not have forced the government to agree to include the appearance of bias claims in the tolling agreement; therefore, petitioner cannot show that the FPD's performance was objectively unreasonable.

The notion that the FPD was ineffective for failing to preserve petitioner's right to raise a § 455(a) recusal claim because it was an "oversight and not a strategic decision" or that the FPD "misled" litigants is not supported by the record. On January 24, 2019, then AUSA Greggory Walters, the USAO's Appellate Chief, emailed FPD Patton and informed him of the argument raised in the *Atwood* brief and supplied FPD Patton with a copy of the case relief upon by Atwood's attorneys. Gov. App. 6-7. This email was forwarded to AFPD Pollock who had recently filed the opening brief in the *Marshon Simon* case. AUSA Walters indicated that if the FPD wished to file an amended brief, the government would have no objection. Gov. App. 8-9. That same day, AFPD Pollock forwarded AUSA Walters's email to FPD Patton and asked, "What do you think about this? I had not planned on raising this on direct appeal…" *Id*.  There is no response from FPD Patton in the records disclosed, but it is unlikely the FPD did not discuss the merits of raising a

§ 455(a) claim in their pending appellate cases. On February 8 and 13, 2019, FPD Patton was included in an email to Judge Shadid's judicial assistant, Cathy Geier, wherein the government submitted a motion and order seeking the court's permission to have limited contact with defendants to notify them of the pending litigation in the *Nixon, Gmoser, Shannon*, and *Atwood* cases, and detailing the grounds alleged in each case. Gov. App. 10-74. On March 15, 2019, AFPD Johanna Christiansen sent an email to FPD Patton and AFPD Henderson discussing the *Atwood* brief encouraging them to read it. Gov. App. 75-76. AFPD Henderson acknowledges that he did. Gov. App. 77.

Indeed, the records reflect that FPD Patton considered and rejected the viability of advancing claims based on a violation of the recusal statute. In an email dated December 4, 2019, AFPD Henderson stated to FPD Patton, "I remembered why we didn't include 455(a) before. O'Malley[13] seems to imply you need to show a possibility of acquittal for anything but the most serious constitutional claims, and a statutory claim under 455(a) might not qualify." Gov. App. 94-95. The FPD was correct. A violation of the federal recusal statute is not a due process violation and therefore not a cognizable

---

[13] AFPD Henderson's email references the Seventh Circuit opinion in *United States v. O'Malley*, 833 F.3d 810 (7th Cir. 2015), which held that a motion for new trial pursuant to Fed. R. Crim. P. 33(a), (b)(1) that "is grounded on newly discovered evidence" "encompasses all claims based on newly discovered evidence which likely would lead to acquittal whether or not because of actual innocence"; *See also United States v. Rubashkin*, 655 F.3d 849, 858 (8th Cir. 2011) (permitting without discussion newly discovered evidence of judicial bias to be pursued under Rule 33 but denying motion because evidence would not have probably led to an acquittal, noting that "the district court's rulings and statements to the jury reveal no evidence of bias or prejudice toward [defendant]."). So too here, no court has found that Judge Bruce's communications would likely lead to an acquittal.

claim for which this Court can grant relief under § 2255. *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d at 1371–72.

While records indicate that the FPD measured, and then rejected, the viability of raising a § 455(a) claim as part of their litigation strategy, nevertheless, FPD Patton directed AFPD Pollock to send a letter to her client along with an affidavit wherein he told her to claim, "My failure to raise an issue under the recusal statute, 18 U.S.C. sec. 455(a) was not based on any litigation strategy. I simply failed to recognize the recusal statute provided the basis for a valid claim that your sentence should be vacated. This was an oversight on my part rather than a strategic decision." Gov. App. 79-93. There is no evidence to support this assertion. On the contrary, the records show that every decision FPD Patton has made after learning of Judge Bruce's communication with the USAO, from his initial complaint to the Seventh Circuit, to his methodical spreadsheets tracking potential claimants, to his steering the petitioner towards a claim of judicial bias (when the petitioner himself never alleged Judge Bruce was biased), has been precisely and strategically designed with the goal of obtaining an institutional litigation advantage for the FPD. FPD Patton encouraged this "influx" of § 2255 motions, even when it was possible that the outcome in a particular case may have been detrimental to the petitioners and resulted in them serving more time in prison. *See e.g. United States v. Burns,* No. 14-CR-20050-SLD (C.D.Ill.)(where petitioner's § 2255 motion would breach his plea agreement with the government and make him ineligible for a § 3553(e) motion for a downward departure below the statutory mandatory minimum); *United States v. Auteberry*, No. 14-CR-20027-SLD (C.D.Ill.)(where petitioner benefitted from an error in

his guidelines calculation and was sentenced 210 months, just above the mandatory minimum. If this Court granted his motion, however, petitioner's guidelines range would be 360 months to life imprisonment, and a sentence to the statutory maximum would not be unreasonable). The FPD's decision to focus on the more serious constitutionally based allegations of actual bias by Judge Bruce in lieu of the less serious statutorily based allegations of a failure to recuse was no oversight. It was a calculated effort to gain the largest strategic advantage (or in the FPD's own words, to cause an "even bigger mess.") Gov. App. 2.

Undoubtedly, courts caution counsel to carefully evaluate their arguments and ensure that any arguments presented are well grounded in both law and fact. *See Stanard v. Nygren* 658 F.3d 792 (7th Cir. 2011) (attorney's arguments characterized as "irrelevant, conclusory and often incoherent"); *see also Practitioner's Handbook to the United States Court of Appeals for the Seventh Circuit* (2019 ed.) § XV(E) at 108. This Court also imposes page and word limitations on pleadings, in part, to focus litigants on their strongest arguments. *See* C.D.Ill. L.R. 7.1(B)(4). "A lawyer, after all, has no duty, indeed no right, to pester a court with frivolous arguments, which is to say arguments that cannot conceivably persuade the court, so if he believes in good faith that there are no other arguments that he can make on his client's behalf he is honor-bound to so advise the court and seek leave to withdraw as counsel." *United States v. Edwards*, 777 F.2d 364, 365 (7th Cir. 1985). Frivolous pleadings can also result in sanctions. *See, e.g., United States v. Collins*, 510 F.3d 697, 698 (7th Cir. 2007) (after affirming the defendant's judgment, the Court ordered counsel "to show cause why he should not be sanctioned for professional misconduct"

for advancing "perfunctory and frivolous" arguments, and sent a copy its opinion to the state bar disciplinary authorities); *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453 (7th Cir. 2005); *Rumsavich v. Borislow*, 154 F.3d 700, 703-04 (7th Cir. 1998). Petitioner has not cited any authority - nor is the government aware of any – that holds that nonconstitutional errors warrant the relief petitioner seeks under § 2255. The FPD therefore had valid strategic reasons -- not advancing unavailing, if not frivolous, arguments -- for not timely alleging that a violation of the federal recusal statute is a due process violation, and petitioner cannot show that failing to do was objectively unreasonable.

Even if the FPD had filed a timely § 2255 claim alleging Judge Bruce's emails show an appearance of bias such that he should have recused himself from petitioner's case under 28 U.S.C. § 455(a), petitioner cannot show he was prejudiced. To establish prejudice, petitioner must show that there is a "reasonable probability" that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694-95. Although untimely, petitioner still advanced this claim in the instant petition for the Court's consideration. Yet, as discussed, this claim is not cognizable under § 2255, and even if it were, the factors under *Liljeberg* weigh against granting petitioner a new sentencing. A decision holding that a mere statutory violation rises to the level of constitutional magnitude would be not only an outlier but also would go against standing precedent in this circuit and throughout the country. *See Williams*, 949 F.3d at 1061; *Railey v. Webb*, 540 F.3d at 415; *Davis v. Jones,* 506 F.3d at 1336; *Johnson v. Carroll*, 369 F.3d at 254; *United States v. Couch*, 896 F.2d at 81; *Hardy v. United States*, 878 F.2d at 97. Given the

overwhelming authority weighing against petitioner's claim, and the dearth of authority supporting his theory, there is simply no reasonable probability that petitioner's outcome would have been different.

Petitioner has failed to show that he was prejudiced by the FPD's alleged ineffectiveness and his motion as to this claim should be denied.


## CONCLUSION

For the reasons stated herein, the United States respectfully requests this Court enter an order denying petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 with prejudice.

Respectfully submitted,

DOUGLAS J. QUIVEY
*United States Attorney*

By:     /S/ ELLY M. PEIRSON
*Assistant United States Attorney*
IL Bar No. 6298075
201 S. Vine Street, Suite 226
Urbana, Illinois 61802
Telephone: (217) 373-5875
elly.peirson@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 17, 2021, I electronically filed the forgoing with the

Clerk of the Court using the CM/ECF system which will send a copy of same to counsel

of record.


<u>/S/ELLY M. PEIRSON</u>
*Assistant United States Attorney*